Filed 10/9/25  Toledo v. Lukes CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| CHRISTOPHER SCOTT TOLEDO, | |
| Plaintiff and Respondent, | E084298 |
| v. | (Super.Ct.No. CVSW2404130) |
| JOHN CHRISTIAN LUKES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeremiah Raxter, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Dordick Law Corporation, Mark J. Leonardo, and Gary A. Dordick for Defendant and Appellant.

No appearance by Plaintiff and Respondent.

John Christian Lukes appeals from both a one-year civil harassment restraining order entered against him and the trial court's denial of his motion for new trial.  (Code

1

Civ. Proc., § 527.6; unlabeled statutory references are to this code.)  Finding no prejudicial error, we affirm the orders.

BACKGROUND

On April 25, 2024, Christopher Scott Toledo applied for a civil harassment restraining order against Lukes.  Toledo coached Lukes's son's little league baseball team in the Temecula Valley Little League (the little league).  Earlier in the season, Toledo had denied Lukes's request to be an assistant coach.

In support of the request for the restraining order, Toledo described the harassment from Lukes as starting in mid-March 2024.  Toledo said that Lukes sent him hundreds of "unhinged" and "erratic" text messages after midnight.  Lukes also sent "erratic" email messages to Toledo and certain officials of the little league.  According to Toledo, Lukes made false claims about Toledo's character "and threatened that [Toledo] ha[d] no idea what [Lukes] will do when it comes to protecting his kids."

Toledo emailed Lukes two days before filing the request and asked him to cease all communication, but Lukes did not comply and last harassed Toledo on the day that Toledo filed the request.  Toledo checked a box on Judicial Council Form CH-100 indicating that he should not be charged a filing fee for the request, because Lukes "has used or threatened to use violence against [Toledo], has stalked [him], or has acted or spoken in some other way that makes [Toledo] reasonably fear violence."

2

The trial court granted a temporary restraining order on April 25, 2024, prohibiting Lukes from having any contact with Toledo. The court set a hearing on the restraining order request in mid-May.

The following day, Toledo filed an amended request for a civil harassment restraining order in which he also sought protection of his two minor sons, who attended games with Toledo. In addition, Toledo attested that Lukes had emailed him that morning that he would be attending the team's baseball game the following night, causing Toledo to feel unsafe. Toledo further described the text messages that Lukes had previously sent, including that Lukes texted Toledo that he was "going to bring his buddies to the field and 'we need to talk,'" and also texted "'Look me up I'm not nice when I see injustice and it's my family.'" In the amended request, Toledo again checked the box on Judicial Council Form CH-100 indicating that he reasonably feared violence by Lukes and thus should not be charged a filing fee.

Lukes filed a responsive declaration in which he extensively described why he sent the text and email messages to Toledo and the little league officials. Lukes attached copies of emails that he had sent and what he described as "the entire text message chain" consisting of a total of 114 messages between Lukes and Toledo from January 29, 2024, through April 24, 2024.

Starting at about 1:00 a.m. on April 15, 2024, within one hour Lukes sent Toledo 29 unanswered text messages, which Lukes later described as "harsh," "unkind," "inappropriate," "vile," and "[u]nflattering." Lukes took issue with Toledo's failure to

3

pick Lukes to be the team's assistant coach and Toledo's decision to pick another parent who was a law enforcement officer. Lukes described details of his personal life in the messages, including that he was involved in a "custody battle" with his ex-wife that caused him to have limited contact with his son. Throughout the messages, Lukes repeatedly insulted the assistant coach and Toledo's coaching. Lukes repeatedly texted variations of, "You have no idea who I am," followed by, "I'm not messing around." He also texted, "Look me up I'm not nice when I see injustice and it's my family," followed by another text saying, "If you bring my kids mom into this then all of my attorneys get involved. And I mean not just family law. So you and I need to speak and bring the cop."

During the afternoon on April 15, 2024, Toledo sent Lukes an email response to the text messages, copying the president and the vice president of the little league (the little league officials). Toledo asked Lukes "to refrain from including [him] in any personal-related issues, sensitive family related matters, harsh critiques of my methods, or speaking negatively against my selected coaches—especially outside of hours reasonable for communication." Toledo said that it would be appropriate for Lukes to contact him to discuss matters regarding team-related topics between 8:00 a.m. and 9:00 p.m.

Several minutes after Toledo sent that email, Lukes texted Toledo and apologized for "being vile in [his] previous messages" and acknowledged that "it was not okay." Lukes later emailed Toledo and the little league officials, extensively described his

4

frustrations with not being chosen as an assistant coach, and explained that in a previous season he had assisted another coach with whom he remained friends. Lukes apologized to Toledo and to the little league officials for his "inappropriate texted communications to Coach Toledo" and promised that it would "not occur again."

The following day, Toledo texted Lukes, thanked him for the response, and remarked that everything "should be good" so long as all communication remained focused "on team-related topics." Lukes responded, "Sounds good to me." Lukes then sent Toledo over 20 unanswered text messages within several minutes of each other providing Toledo coaching advice and discussing his son's performance, culminating in Lukes telling Toledo that he would not attend that night's game because he had to work. Toledo responded to the final message, "Bummer about getting stuck at work."

One week later, on April 23, 2024, Lukes sent Toledo another series of 17 text messages starting at approximately 10:15 p.m. Lukes accused Toledo and another coach of (1) inflicting "violence" on Lukes by scowling, smirking, and grinning at him, (2) publicly humiliating Lukes during a game, and (3) "tak[ing] it out on [Lukes's] son." Lukes did not specify exactly what had happened. Among the messages sent, Lukes texted, "We have issues," followed by "You're done," and "You have no idea clearly what I do legally to protect my kids. And it's not kangaroo family court anymore." Lukes told Toledo to check his email, because Lukes had involved his lawyers.

5

Attached to Lukes's responsive declaration is a long email thread between Lukes and some combination of Toledo, the little league officials, and Lukes's attorneys, with 22 total messages sent between April 23, 2024, and April 25, 2024, starting at 10:20 p.m. on April 23. Lukes sent 20 of the 22 messages.[1] Lukes's email messages included the same accusations that he had texted to Toledo in the middle of the night on April 23 and 24, with some additional detail, including that Lukes believed that Toledo and another coach had acted punitively toward Lukes's son by yelling at him during a game and telling Lukes's son not to listen to Lukes. Lukes indicated that the issue should be investigated by child protective services, and he demanded that the little league officials remove Toledo and the other coach. Lukes repeatedly stated that he was "fully prepared to escalate the issue beyond the League," and he repeatedly indicated that he had copied his attorneys on the emails. Lukes's attorneys appear as copied recipients on one of the messages.

A little after midnight on April 24, 2024, Toledo emailed Lukes that he was "very confused" by the hours-long "stream of threatening and accusatory texts" and email messages sent by Lukes, which Toledo noted included threatened legal action. Toledo denied engaging in any of the behavior Lukes alleged. Toledo wrote: "I do not appreciate being harassed at all hours of the night—in fact, you are currently still

---

[1] The most recent email message in the series sent between April 23, 2024, and April 25, 2024, lists the little league officials as the email's recipients, and the remaining messages appear to be replies, responses, or forwards to some combination of the little league and Toledo. Most of the subordinate messages do not include the recipients' addresses, but many of the messages include salutations identifying the recipient.

6

continually sending me harassing texts while I type this email at 11:54pm!  Your texts are a mix of bashing me, threatening me, and attempts to goad me into actions such that you can have some form of legal basis to action against me. . . .  I would respectfully request that you cease communicating with me all together."  (Underscoring omitted.)  Within 20 minutes, Lukes emailed Toledo and continued to accuse him of bullying and defaming him and yelling at his son.  In that message, Lukes remarked, "I'm sober lucid and I can do this forever."

The little league president emailed Lukes on April 25, 2024—the day that Toledo filed the initial request for a restraining order—and informed Lukes that the little league was investigating the alleged incident and asking Lukes to cease and desist all communications with any managers, coaches, or board members of the little league. Lukes responded by sending two email messages within the next 30 minutes.  The following day—the same day that the court issued the temporary restraining order protecting Toledo—Lukes emailed the little league officials and Toledo that he would withdraw his complaint if they could all mutually agree that Lukes's son would not be targeted and that there would be no further one-on-one communication between him and the coaches.

The court held a hearing on the restraining order request on May 16, 2024.  Both Toledo and Lukes appeared at the hearing, represented themselves, and testified.  At the hearing, the court indicated that it had reviewed the documentation submitted by both parties.

7

Toledo testified that he applied for the restraining order because Lukes had harassed him with his "very erratic behavior." Toledo testified extensively about the text messages and the emails that Lukes had sent. Most of Toledo's trial presentation consisted of screenshots of the text messages displayed on an ELMO. While Toledo displayed the messages, the court indicated for some that it was reading them in the moment as they were displayed. The court otherwise indicated that it had previously read some messages. The record on appeal does not contain a copy of the displayed screenshots.

The court asked Toledo if Lukes's son was still playing on a team that Toledo coached, and Toledo said that he was. Lukes asked Toledo, "The season over?" Toledo responded, "No." The court repeated the question, and Toledo answered, "We're in the playoffs right now." The court asked Toledo if Lukes could livestream games, and Toledo explained that when he applied for the restraining order he wanted no contact with Lukes, so he had removed Lukes from the GameChanger app as a person permitted to livestream the games.

The court asked Lukes if he denied sending any of the text messages that Toledo had displayed, and Lukes responded that he did not. After Lukes made that admission, the court remarked: "Okay. That's all I need to know." Lukes argued that the only messages that were possibly problematic were the ones that he sent in the middle of the night on April 15, 2024, but he explained that they were limited to a one-hour period, and he subsequently apologized for sending them. Lukes argued that those messages were

irrelevant because Toledo accepted the apology, thus demonstrating to Lukes that the issue was resolved. The court asked Lukes if he thought his behavior was inappropriate, and Lukes responded, "My behavior was inappropriate with respect to the text messages over one hour of period of time on the 4/15 and 4/24. No other behaviors were inappropriate." Lukes believed that "[e]verything else" he did was "fine," describing his subsequent text messages as "[n]ormal, cordial text messages until after he retaliated against me for those text messages."

Lukes argued that Toledo had failed to demonstrate by "clear and convincing evidence that [Toledo] was subjected to emotional harm or duress in any way." The court construed the argument as a contention that Toledo had not "proven that he was under duress or anything like that." The court responded that Lukes did not need to "prove duress" but rather needed to prove only that the text messages "seriously alarm, annoy, or harass a person [and] serve[] no legitimate purpose."

After hearing both parties' testimony, the court granted Toledo's request for a restraining order. The court expressly rejected Lukes's characterization and perception of his text messages. The court reasoned that Lukes's conduct toward Toledo was a "knowing and willful course of conduct directly to a specific person that seriously alarms, annoys, harasses the person, and serves no legitimate purpose." The court ordered Lukes to stay at least 100 yards away from Toledo, his two minor sons, and any little league event involving Toledo or his team for one year, until May 16, 2025. The court ordered

Toledo to add Lukes back to GameChanger so that Lukes could watch the games via livestream.

Two weeks after the trial court issued the restraining order, Lukes filed a notice of intent to move for a new trial. Lukes stated that the motion would be made on several statutory grounds listed in section 657, including insufficiency of the evidence, newly discovered evidence, and legal error. Lukes stated that the motion would be based on the notice, the parties' filings, the evidence presented at trial, and a yet-to-be-filed memorandum of points and authorities.

In a minute order entered on June 17, 2024, the court stated that it had read and considered the notice of intent to file the motion for new trial and made the following order: "This is a hearing that has already concluded. The proper procedure appears for the party to appeal the decision. I do not have any legal authority to grant a new trial." The following day, the court sent an electronic notice that it had rejected the e-filing of the motion and proposed order for the following reason: "Per minute order on 6/17/2024, the court does not have legal authority regarding a motion for new trial." In a minute order entered on July 8, the court stated that it had read and considered a memorandum of points and authorities that Lukes submitted in support of a motion for new trial. The court found the document to be the same motion that it previously denied, and the court again ordered the motion for new trial denied. Several days later, Lukes filed the memorandum of points and authorities. Handwriting above the file-stamp from the superior court reads, "Filed on demand." A declaration from Lukes is attached to the

10

memorandum of points and authorities, with accompanying exhibits attached to the declaration. The declaration is not signed.

DISCUSSION

I. *The restraining order*[2]

Lukes contends that the trial court erred by granting the civil harassment restraining order because the court misapplied the standard under section 527.6. Lukes also challenges the sufficiency of the evidence that (1) the course of conduct would have caused a reasonable person to suffer substantial emotional distress or that it actually caused Toledo to suffer any emotional distress, and (2) the harassment was likely to recur. We find no prejudicial error.

A. *Legal framework*

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*); *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) An appellant bears the burden of demonstrating, "on the basis of the record presented to the appellate court, that the trial court committed an error that

---

[2] The one-year civil harassment restraining order expired while the appeal was pending. In light of the restraining order's expiration, we asked Lukes to file a supplemental brief addressing why this appeal should not be dismissed as moot (see *Nebel v. Sulak* (1999) 73 Cal.App.4th 1363, 1368), which he did. In a signed supporting declaration, Lukes attests that his ex-wife is using the restraining order against him in family law proceedings. We exercise our discretion to consider the appeal. (*San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 564 ["An appeal from an expired restraining order is not moot if it could have collateral consequences in future proceedings"].)

11

justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*).) It is the appellant's burden to provide an adequate record on appeal. (*Ibid.*) The failure to provide an adequate record on an issue requires that the issue be resolved against the appellant. (*Ibid.*)

Section 527.6 provides that the trial court must issue a restraining order if the court finds "by clear and convincing evidence that unlawful harassment exists." (*Id.*, subds. (a)(1), (i).) The statute defines harassment as "a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3) (§ 527.6 (b)(3)).) "[S]ubstantial emotional distress" is not statutorily defined but has been judicially construed to mean "highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' [citation], which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.'" (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762-763 (*Schild*).)

Even if harassment has been shown, a prohibitory injunction restraining future conduct is authorized only if there is a reasonable probability that the harassment will recur. (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 499 (*Harris*); *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 400, 404.) In determining whether the record contains

12

substantial evidence of a reasonable probability that the harassment will occur in the future, we consider the nature of the harassment "'evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.'" (*Harris*, at pp. 499-500.)

We review for substantial evidence the trial court's express and implied factual findings in granting a civil harassment restraining order (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 (*R.D.*)), taking into account the level of confidence that the "clear and convincing evidence" standard demands (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995). "We resolve all factual conflicts and questions of credibility in favor the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild*, *supra*, 232 Cal.App.3d at p. 762.)

B.     *Substantial emotional distress*

Lukes argues that the trial court erroneously believed that it was not required to find that Lukes's conduct (1) would cause a reasonable person to suffer substantial emotional distress and (2) actually caused Toledo substantial emotional distress, and Lukes argues that the court consequently failed to make those required findings. We conclude that any error was harmless.

13

The record does not demonstrate that the court held the erroneous belief described by Lukes.  In the cited portions of the reporter's transcript, the court correctly rejected Lukes's claim that Toledo was required to prove "duress," but the court did not say that Toledo was not required to prove that he actually suffered substantial emotional distress or that a reasonable person would too.

But it is true that the court did not expressly find that Toledo actually suffered substantial emotional distress or that a reasonable person would too.  Rather than apply the doctrine of implied findings (*R.D.*, *supra*, 202 Cal.App.4th at p. 188), we will assume for the sake of argument that the trial court failed to make those required findings and thereby erred.  The trial court found that Lukes's email and text messages to Toledo constituted harassment under section 527.6(b)(3) as "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose."  In making that determination, the trial court explicitly rejected that it had to consider whether the course of conduct actually caused Toledo to suffer substantial emotional distress or would cause a reasonable person to suffer substantial emotional distress.  This was contrary to the law.  Section 527.6(b)(3) mandates that the court consider both of those elements.  By not considering the statutorily required factors, the trial court erred.

Lukes does not argue that the error was prejudicial.  Reversal is not warranted by "error alone."  (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822.) The appellant bears the burden of demonstrating that "'the claimed error is prejudicial;

14

i.e., that it has resulted in a miscarriage of justice.'" (*In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337; Cal. Const., art. VI, §13.) "A miscarriage of justice is not found 'unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result.'" (*Falcone*, at p. 823.) We will not "act as counsel for appellant by furnishing a legal argument as to how the trial court's ruling was prejudicial." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963 (*Century Surety*); *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Because Lukes has failed to argue that the error was prejudicial, he has failed to carry his burden of establishing reversible error. (*Century Surety*, at p. 963.)

Lukes does argue, however, that there is insufficient evidence that the course of conduct would have caused a reasonable person to suffer substantial emotional distress and that it actually caused Toledo to suffer substantial emotional distress. The argument fails for two reasons.

First, the record on appeal is not adequate to review the challenge to the sufficiency of the evidence. The record does not include the screenshots of text messages that Toledo displayed at trial, and no one testified that the screenshots were the same as those attached to Lukes's responsive declaration. We cannot presume that the displayed messages were the same ones that Lukes attached to his responsive declaration, because "all intendments and presumptions are indulged in favor of" the correctness of the trial court's order. (*Arceneaux*, *supra*, 51 Cal.3d at p. 1133.) By failing to include the evidence that the court relied on at the hearing in the record on appeal, Lukes has failed

15

to carry his burden of providing an adequate record to facilitate review of his challenges to the sufficiency of the evidence. (*Jameson*, *supra*, 5 Cal.5th at p. 609.) We accordingly must resolve the issues against him. (*Ibid.*)

Second, even the inadequate record before us contains sufficient evidence to support findings by clear and convincing evidence that Lukes's course of conduct would have caused a reasonable person to suffer substantial emotional distress and that it actually caused Toledo to suffer substantial emotional distress. Over the course of a 10-day period, Lukes twice sent Toledo a long series of disparaging and uncivil text messages during the middle of the night. Lukes apologized for the first series of messages, and he admitted that both series were inappropriate, while additionally characterizing the first set of messages as vile, harsh, and unkind. The second series of late-night text messages was accompanied by a series of equally disparaging email messages that were sent to Toledo and the little league officials. In those emails, Lukes demanded an investigation, demanded removal of Toledo, and threatened to escalate the matter. Lukes accused Toledo of acting violently toward him by scowling and smirking at Lukes and also accused Toledo of engaging in child abuse for reprimanding Lukes's son during a baseball game. Lukes threatened to take legal action against Toledo and even threatened to involve child protective services. Moreover, Lukes was undeterred by Toledo's direct request after the first series of late-night text messages that Lukes not contact him after 9:00 p.m. and only communicate with him in a professional manner. Despite agreeing to that request and even apologizing for the behavior, Lukes

16

nevertheless repeated the same behavior within one week. Toledo emailed Lukes during the flurry of text messages and emails sent by Lukes during the second incident and asked Lukes to cease all communications, but Lukes continued to send unprofessional, disparaging, and threatening emails and text messages. Lukes similarly failed to comply with the little league president's subsequent request that Lukes stop all communications with everyone involved in the little league. A reasonable trier of fact could conclude from all of that evidence that Lukes's course of conduct would have caused a reasonable person to suffer substantial emotional distress. (See *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405-1406, 1414 [finding that several disturbing letters and telephone calls constituted a "socially unacceptable course of conduct" that "would have seriously alarmed, annoyed, or harassed a reasonable person, and would have caused a reasonable person to suffer substantial emotional distress"].)

The record also contains ample evidence that Toledo actually suffered substantial emotional distress, even though Toledo never directly testified to that. "A trial court may infer substantial emotional distress from the nature of the harassing conduct." (*E.G. v. M.L.* (2024) 105 Cal.App.5th 688, 705.) Toledo attested that he feared violence by Lukes and did not feel safe about the prospect of Toledo attending another baseball game. While Lukes was sending the second series of late-night text and email messages, Toledo emailed Lukes and asked him to cease all communication, and Toledo expressed confusion about the accusatory, threatening, and disparaging messages. After Toledo made that request, Lukes quickly responded that he could continue doing "this forever."

17

Toledo immediately applied for a restraining order. A reasonable trier of fact could infer from that evidence that the barrage of text and email messages caused Toledo to suffer substantial emotional distress, that is, "highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' [citation], which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.'" (*Schild*, *supra*, 232 Cal.App.3d at pp. 762-763.)

Lukes's only argument to the contrary is that Toledo's acceptance of his apology after the first series of late-night text messages and Toledo's message telling Lukes that it was a "bummer" that he could not attend a game the next day demonstrate that Toledo did not suffer substantial emotional distress and that no reasonable person would have. The argument is meritless. First, the argument ignores the series of disparaging, threatening, and accusatory late-night emails and text messages that Lukes sent one week later. Second, even assuming that Toledo's acceptance of the apology demonstrated that he was not experiencing substantial emotional distress at that moment, a reasonable trier of fact could reasonably infer that Toledo's feelings about the first series of messages changed once Lukes repeated the same behavior despite the apology and the promise to refrain, thus causing Toledo to reevaluate the sincerity of the apology and to ask Lukes not to communicate with him at all.

C.      *Likelihood of recurrence*

Lukes also argues that the record does not contain substantial evidence that the harassing conduct was likely to recur. Again, we disagree

The relationship between Lukes and Toledo was based entirely on Toledo's position as coach of Lukes's son's little league baseball team. Ongoing events involving the baseball team were the basis for Lukes's communications with Toledo. Toledo testified that he still coached that team and that the season was not over. A reasonable factfinder could therefore infer that Toledo and Lukes were likely to have future interactions and that Lukes would have reason to continue communicating with Toledo. (*Harris*, *supra*, 234 Cal.App.4th at p. 501.) Moreover, Lukes expressing willingness to continue sending Toledo harassing messages when he wrote Toledo that he could "do this forever" in response to Toledo's request to cease all communications. Taken together, all of that evidence is sufficient to support a finding that harassment was likely to occur in the future absent an injunction.

Lukes's contrary arguments are unavailing. Lukes contends that the evidence is insufficient because "the baseball season was over the night before this trial." The assertion is contrary to the evidence and therefore fails. Lukes also contends that there was no likelihood of recurrence given Lukes's previous apology. The trial court could reasonably decline to draw that inference, because Lukes sent Toledo another series of harassing text and email messages after apologizing.

D.     *Protected activity*

Finally, Lukes argues: "As of the date of the trial Lukes had sent no other text messages or emails to Toledo except when reporting to the [the little league] Board his claim of child abuse where Toledo is on the board. [Citation.] This protected activity

19

cannot form the basis of civil harassment." The argument is forfeited. "To demonstrate error, [the] appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Lukes does neither. He does not explain which of the messages that he sent constitute protected activity, and he does not support the argument with any citation to messages in the record. Instead, the only citation to the record that he provides is to a printout listing Toledo as a board member of the little league. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 ["'It is the duty of a party to support the arguments in its briefs by appropriate reference to the record'"].) In addition, Lukes does not provide any legal analysis explaining why any of the messages constitute protected activity. The conclusory assertion that the unspecified messages constitute constitutionally protected activity is accordingly forfeited. (*S.C.*, at p. 464.)

E. *Conclusion*

For the foregoing reasons, we conclude that Lukes has not shown any prejudicial error in the granting of the one-year civil harassment restraining order.

II. *The new trial motion*

Lukes contends that the evidentiary hearing on Toledo's request for a restraining order constitutes a trial, so the trial court erred by failing to consider his motion for a new trial. Lukes fails to demonstrate that the claimed error prejudiced him.

Section 657 enumerates the seven grounds on which a trial court may vacate a verdict "and any other decision may be modified or vacated, in whole or in part, and a

new or further trial granted on all or part of the issues, on the application of the party aggrieved." Section 656 defines "new trial" as "a re-examination of an issue of fact in the same court after a trial and decision by a jury, court, or referee." The potential grounds for a new trial include "[i]rregularity in the proceedings of the court," "[a]ccident or surprise," "[n]ewly discovered evidence, material for the party making the application, which he [or she] could not, with reasonable diligence, have discovered and produced at the trial," insufficient evidence to justify the court's decision or that the decision is against the law, and an error of law. (§ 657.) A party moving for new trial based on newly discovered evidence must show that the evidence "could not with reasonable diligence have been discovered and produced earlier." (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 438 (*Missionary Guadalupanas*).)

"'[T]he trial court is bound by the rule of California Constitution, article VI, section 13, that prejudicial error is the basis for a new trial, and there is no discretion to grant a new trial for harmless error.'" (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161 (*Sherman*); *People v. Ault* (2004) 33 Cal.4th 1250, 1262-1263.) In reviewing an order denying a motion for new trial, "we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872.)

21

Assuming for the sake of argument that the trial court erred by not entertaining the new trial motion, Lukes nevertheless fails to argue that the error was prejudicial, so he has failed to carry his burden of demonstrating prejudice. (*Century Surety*, *supra*, 139 Cal.App.4th at p. 963.) In any event, we conclude that the claimed error was harmless.

Lukes moved for a new trial on the following grounds: (1) The trial court applied the wrong legal standard by failing to consider whether Lukes's conduct actually caused Toledo substantial emotional distress or would cause a reasonable person substantial emotional distress, (2) the evidence was insufficient to support the required findings on those issues, (3) there was insufficient evidence that the harassment was likely to recur, and (4) newly discovered evidence demonstrated that the baseball team's season ended the night before the hearing, demonstrating that Toledo lied at the hearing and that the harassment was not likely to recur. In the unsigned declaration that Lukes filed in support of the new trial motion, Lukes stated that the little league adopted a single-game elimination format for the playoffs and that the team's first playoff game had occurred the night before the hearing. Lukes learned after the hearing that the team lost the game. According to Lukes, that loss meant that the season was over and that Toledo had lied when he testified to the contrary. Lukes said that he had "no way of knowing the outcome of the game" before the hearing, because his ex-wife would not allow him to communicate with his son and because he was not able to livestream the game. To support the assertion that his son's team lost, Lukes attached screenshots from the GameChanger app that Lukes obtained from a parent of a player on the opposing team.

22

The arguments concerning the legal standard and the sufficiency of the evidence lack merit for the reasons we have already explained. Those arguments consequently fail to show that it is reasonably probable that Lukes would have obtained a more favorable result if the trial court had considered the merits of the new trial motion.

It also is not reasonably probable that the trial court would have granted the motion on the ground of newly discovered evidence. First, the motion was not supported by any evidence, because Lukes did not sign the supporting declaration. "A declaration not signed under penalty of perjury under the laws of California has 'no evidentiary value' and can be disregarded." (*Safieddine v. MBC FZ, LLC* (2024) 103 Cal.App.5th 1086, 1094, fn. 9.)

Second, Lukes failed to demonstrate that the evidence "could not with reasonable diligence have been discovered and produced earlier." (*Missionary Guadalupanas*, *supra*, 38 Cal.App.5th at p. 438.) Lukes obtained information about the playoff game's results after the hearing from a parent of the opposing team. Lukes also had previously emailed Toledo and the little league officials that he remained friends with another coach in the little league. Lukes's unsigned declaration does not attempt to explain why he could not have asked those individuals about the result of the game before the hearing. A showing of reasonable diligence would require such an explanation. (*Ibid.*)

For all of these reasons, Lukes has not shown that it is reasonably probable that the trial court would have granted his new trial motion if the court had considered the motion on the merits.

## DISPOSITION

The May 16, 2024, order granting Toledo a one-year restraining order against Lukes is affirmed.  The trial court's June 17, 2024, and July 8, 2024, orders denying the motion for a new trial are affirmed.  Toledo shall recover his costs of appeal, if any.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

CODRINGTON

Acting P. J.

FIELDS

J.